IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

TODD PAULUS IV,

                        Plaintiff,

        v.

TROY ENGER,[1]

                        Defendant.

OPINION and ORDER

24-cv-178-jdp

---

Petitioner Todd Paulus is serving a term of extended supervision under the custody of the Wisconsin Department of Corrections' Division of Community Corrections. Paulus seeks a writ of habeas corpus under 28 U.S.C. § 2254. The matter is fully briefed and ready for decision.

Paulus challenges his 2020 Wisconsin state-court conviction for enticement of a child with intent to have sexual contact, in violation of Wis. Stat. § 948.07(1). Fourteen-year-old KCP, who was Paulus's ex-girlfriend's niece, alleged that Paulus sexually assaulted her while she was spending the night at his house. At trial, Paulus argued that KCP had fabricated the allegations, and he sought to introduce evidence that KCP had viewed pornography before her interview with detectives that depicted sexual acts similar to those that she alleged Paulus had done to her. The trial judge excluded the pornography, finding that the risk of unfair prejudice substantially outweighed its minimal probative value. Paulus contends that the exclusion of

---

[1] Petitioner originally named Maria Silao-Johnson, the superintendent of Winnebago Correctional Center, as the respondent. But petitioner has since been released on extended supervision, so the proper respondent is Troy Enger, administrator of the Wisconsin DOC's Division of Community Corrections. *See Hogan v. Hanks*, 97 F.3d 189, 190 (7th Cir. 1996) ("If the petitioner is on parole, the parole board or equivalent should be named."). The court has updated the caption accordingly.

the pornography violated his constitutional right to present a defense. He also contends that the state court of appeals erred by concluding that the exclusion was harmless error.

The court concludes that the exclusion of the pornography evidence did not violate Paulus's right to present a defense, because it was at most minimally relevant to whether KCP had fabricated the allegations, and its introduction carried a substantial risk of unfair prejudice and confusion to the jury. Nor did the state court of appeals act unreasonably in concluding that the exclusion of the pornography was harmless error. Paulus's habeas petition will be denied.

BACKGROUND

In January 2019, 14-year-old KCP accused Paulus of sexually assaulting her while she was staying overnight at his house a few weeks earlier. When she was first interviewed by detectives, KCP provided only sparse details about the assault, explaining that a friend of her dad's "kissed her" and then "it turned into more." Dkt. 15-6. At a forensic interview four days later, KCP provided a much more detailed account of the assault. She said that Paulus had brought her into his bedroom, laid on his back with her sitting on top of him, and moved her back and forth over his underwear until he ejaculated. She also said that Paulus had put his finger underneath her underwear and into her vagina. Dkt. 7-1 (criminal complaint), at 1–2. Paulus denied sexually assaulting KCP.

## A. Trial court proceedings

The state charged Paulus with one count of sexual assault of a child, in violation of Wis. Stat. § 948.02(2), and one count of child enticement, in violation of Wis. Stat. § 948.07(1).

2

To support his theory that KCP had fabricated the sexual assault allegations, Paulus wanted to introduce evidence that in the four days between her initial interview with detectives and her forensic interview, KCP had viewed pornography on her phone that depicted sexual acts similar to what she alleged Paulus had done to her. Specifically, KCP viewed a video called "Grinding StepDads Cock for Cash" four separate times on the day of her forensic interview. Dkt. 18-1 (screenshot of KCP's viewing history). She also saved several pornographic images, including one of a "woman wearing underwear sitting on a naked man's lap while the man has his hand on her vagina over her underwear." Dkt. 7-3 (trial transcript, day 2, 10:8–14).[2]

Just before trial, the court held a hearing on Paulus's request to introduce evidence of the pornography that KCP had viewed. Paulus argued that the pornography was admissible as an "alternate source of knowledge of sexual content," to rebut a jury inference that KCP wouldn't know about the sexual experiences that she described unless Paulus had in fact assaulted her. Dkt. 7-2 (trial transcript, day 1, 11:1–12:18). Paulus also argued that the evidence was admissible to explain why KCP described the sexual assault in only general terms during her initial interview with investigators but then provided significantly more detail during her forensic interview. *Id.* at 14:1–20. The court excluded the pornography under Wis. Stat. § 901.403, concluding that the risk of prejudice substantially outweighed any marginal relevance. *Id.* at 17.

---

[2] None of the pornographic images or videos are in the record. This description of the pornographic image on KCP's phone was provided to the trial court by defense counsel. The state did not dispute defense counsel's description of the image, although it did dispute the extent to which the image resembled the alleged assault. Dkt. 7-3 (trial transcript, day 2, 10:15–25).

3

The court revisited the pornography issue at the close of the first day of trial and in a pretrial hearing just before the second day of trial. *Id.* at 199–209; Dkt. 7-3, at 5–11. Paulus reiterated his position that the evidence was necessary to his defense, arguing:

> This whole case is about the allegation of sexual contact. Evidence of an alternate source of her knowledge does make the sexual contact with Mr. Paulus less likely than it does without the evidence because it gives the jury another theory to consider.

Dkt. 7-2, at 202:14–18. Paulus acknowledged that the pornography evidence could be embarrassing to KCP, so he proposed introducing it through the detective who had examined KCP's phone, instead of through KCP herself. *Id* at 202:19–24*.* After hearing Paulus's argument and the state's response, the court reaffirmed its decision to exclude the evidence under § 904.03. The court reasoned that the pornography was of limited relevance to explaining KCP's sexual knowledge, because the jury would be unlikely to infer that a 14-year-old adolescent lacked knowledge of sexual matters. Dkt. 7-3, at 7–8. The court also rejected Paulus's argument that the pornography explained how KCP had come up with additional details about the assault during her forensic interview. The judge reasoned that, in addition to the video and image described by the defense, KCP had viewed other pornographic content that was not similar to the sexual acts that she had described to investigators, undermining Paulus's theory that KCP used the pornography to fabricate her allegations. Nor did Paulus have any evidence about KCP's pornography habits in the months before or after she reported the assault, so he had no reason to assume that viewing pornography like this was out of the norm for KCP. *Id.* at 8–9. Finally, the court concluded that the risk of prejudice outweighed any probative value, because "it's fairly likely that [the pornography] could be used or interpreted by the jury for wrong reasons, such as many of the reasons that the rape shield statute exists." *Id.* at 9:17–24.

At trial, the state had no physical evidence corroborating KCP's allegations that Paulus had sexually assaulted her. The primary evidence against Paulus was KCP's testimony about the assault. The state also introduced Snapchat messages between Paulus and KCP, in which Paulus called KCP "hon" and "sweetheart," Dkt. 15-4, at 1,7,9, told her that he had had a "nice dream" about her, *Id.* at 3, and asked her, "Why are you feeling so alone tonight? Are you just needing company or are you craving more?" *Id.* at 5. A detective testified about the physical features of Paulus's bedroom, which matched KCP's description of the bedroom when she testified. Dkt. 7-3, at 119–22. The detective also testified that when he interviewed Paulus in mid-January 2019, Paulus told him that KCP had visited his house on two occasions with her cousin or her sister, but Paulus did not mention KCP ever visiting his house alone until the detective explicitly asked whether she had been there on December 29. Dkt. 7-3, at 174.

Paulus attempted to portray his relationship with KCP as innocent. Under cross-examination, KCP testified that she had a rocky relationship with her dad and that she would sometimes go to Paulus's house to escape. Dkt. 7-3, at 24–25. The day of the alleged assault, KCP asked Paulus if she could stay the night at his house and told her dad that she was going to a friend's house. Dkt. 15-4, at 7. Paulus arranged to pick KCP up at a gas station near her house, something that Paulus had done before at KCP's insistence so that her dad wouldn't know where she was going. Dkt. 7-3, at 27–30, 39; Dkt. 15-4 at 8. KCP said that the day after the alleged assault, Paulus gave her an old cellphone of his as a gift and helped her to set it up; he then took her out for pizza and dropped her back off near her house. KCP later messaged him on Snapchat, "Todd, i'm not in trouble" and "Thank you lots!" Dkt. 15-4, at 8. They continued to message regularly until mid-January, when KCP reported the assault to the police.

5

Paulus also introduced evidence of inconsistencies in KCP's account of the assault. A friend of KCP's testified that it was he who first suggested to KCP that she may have been assaulted: he noticed that KCP seemed sad and asked her if she had been raped. Dkt. 7-3, at 226:5–6. Only then did KCP tell the friend that she had been "fingered" by her dad's friend Todd. *Id.* at 227:6–18. She told another friend that her dad's friend had kissed her and "ended up with his clothes off and his hand over her mouth," but that it "didn't go any further than that." *Id.* at 181. She told a school counselor that she had been assaulted by a "neighbor" who was an adult male who had graduated high school. *Id.* at 56–57. KCP explained that she didn't want to tell the whole truth initially, so she "made a few things up . . . to kind of warm myself up" to the idea of telling an adult. *Id* at 56:25–57:3.

At the conclusion of the evidence, Paulus exercised his constitutional right not to testify. The jury reached a split verdict: Paulus was convicted of one count of child enticement in violation of Wis. Stat. § 948.07(1), but he was acquitted on the sexual assault charge. The court sentenced Paulus to four years of initial confinement followed by four years of extended supervision.

## B. Appellate proceedings

Paulus appealed his conviction to the Wisconsin Court of Appeals, contending that the trial court's exclusion of the pornography evidence violated his constitutional right to present a defense. In an unpublished summary disposition, the court affirmed Paulus's conviction. *State v. Paulus*, No. 2022AP194-CR, 2023 WL 4195567 (Wis. Ct. App. June 27, 2023). The appeals court declined to decide whether it was improper for the trial court to exclude the pornography evidence. Instead, it proceeded under a harmless error analysis, concluding that any error had been harmless for two reasons. First, the child enticement charge did not require the state to

prove actual sexual contact between Paulus and KCP; all the state had to prove was that Paulus caused KCP to go into a room with the *intent* of having sexual contact with her. The court reasoned that Paulus's own statements, including his Snapchat messages and his participation in picking KCP up without her father's knowledge, were strong evidence of improper intent; whether KCP had downloaded pornography had no bearing on Paulus's intent. Second, the jury's acquittal on the sexual assault charge indicated that the jury had disbelieved KCP about the details of the assault, so additional evidence undermining KCP's credibility would not have changed the outcome.

Paulus's petition for review in the Wisconsin Supreme Court was denied on December 12, 2023. *State v. Paulus*, 2024 WI 5, 6 N.W.3d 689. Paulus timely filed this habeas petition on March 20, 2024.

ANALYSIS

To succeed in his habeas petition, Paulus must show both that the trial court violated his constitutional right to present a defense by excluding evidence about the pornography that KCP viewed before her forensic interview, and that the error was not harmless.

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), this court applies a deferential standard of review to any issue that the state court of appeals addressed on the merits, upholding the state court decision as long as the state court decision rests on a "reasonable" application of clearly established federal law. 28 U.S.C. § 2254(d). Issues not addressed by the state court are reviewed de novo. *Harris v. Thompson*, 698 F.3d 609, 624 (7th Cir. 2012). In this case, the state court of appeals relied on a harmless error analysis to affirm Paulus's conviction, so the court reviews the harmless error issue deferentially and the

underlying constitutional issue de novo. But both issues ultimately turn on the probative value of the pornography evidence. For that reason, the court will begin with the question whether a constitutional error was committed in the first place. The court's decision on that issue is dispositive, but for completeness, the court will also examine the reasonableness of the Wisconsin Court of Appeals' harmless error decision.

### A. Right to present a defense

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (internal quotations and citations omitted). This right is not unlimited. States retain broad latitude under the Constitution to establish rules to ensure that the evidence presented during criminal trials is fair and reliable. *Chambers v. Mississippi,* 410 U.S. 284, 302 (1973). Defendants do not have an "unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). The exclusion of defense evidence abridges a defendant's right to present a defense only if the evidence is essential to the defendant's ability to present a defense, and its exclusion is arbitrary or disproportionate to the purposes advanced by the exclusion. *See Harris*, 698 F.3d at 626.

The court begins with a threshold issue about the record. After the state filed its response brief, Paulus moved to supplement the record with an exhibit that was part of the sealed record in the state court of appeals. Dkt. 18. The proposed exhibit is KCP's web history from January 14, 2019; it shows that she viewed a video called "Grinding StepDads Cock for Cash" four times that day. Paulus explained in his motion that he was submitting the proposed

8

exhibit to clear up a factual issue in the state's response brief. The state had said that KCP had searched for the term "Grinding StepDads Cock for Cash," whereas in reality, that was the name of the video that KCP had watched. The state opposed Paulus's motion to supplement, contending that Paulus had forfeited any arguments about the proposed exhibit by failing to raise them in his opening brief. Dkt. 24. Alternatively, the state requested that it be allowed to submit the other sealed exhibits showing KCP's internet activity that were part of the state court record.

The court will grant Paulus's motion to supplement. The state is correct that arguments not raised in a petitioner's opening brief are forfeited. *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009). But Paulus submitted the proposed exhibit to respond to a factual error in the state's brief; he wasn't raising an entirely new argument that he could have raised in his opening brief. The state's request to submit the other sealed exhibits will be denied as unnecessary. The parties agree about what types of pornography KCP viewed. They disagree about whether the pornography depicts the same sex acts that Paulus is alleged to have committed, but the court does not need to resolve that dispute. For the purpose of Paulus's petition, the court will credit Paulus's view that the "Grinding StepDads Cock for Cash" video and the image that defense counsel described as a "woman wearing underwear sitting on a naked man's lap while the man has his hand on her vagina over her underwear" depict sexual acts substantially similar to what Paulus is alleged to have done to KCP. As explained below, that assumption does not change the court's conclusion that Paulus's constitutional rights were not violated.

The core question in this case is whether the pornography evidence was essential to Paulus's defense, and, if so, whether excluding it was an arbitrary or disproportionate response to the purposes advanced by the exclusion. *See Holmes*, 547 U.S. at 324–25. Paulus says that

9

the evidence was essential for two reasons: first, it provides an alternate source of KCP's sexual knowledge; and second, it explains "how KCP went from being unable to provide any detail of the purported assault at her first interview to providing a detailed, graphic account of sexual activity just a few days later." Dkt. 9, at 13–14.

Paulus invokes what is sometimes called the "sexual innocence inference theory." The basic premise is that the jury might infer that a child complainant lacks the sexual knowledge needed to fabricate sexual assault allegations. *See* Child abuse cases: Admissibility on source of knowledge, 3 Jones on Evidence § 19:60 (7th ed.). In certain cases, courts have held that evidence necessary to rebut the sexual innocence inference, such as evidence that a child has been exposed to pornography or has had previous sexual experiences, is so essential to a defendant's case that its exclusion under rape shield or other rules of evidence violates the Constitution. *See, e.g., State v. Pulizzano*, 155 Wis. 2d 633, 456 N.W.2d 325 (1990); *LaJoie v. Thompson*, 217 F.3d 663, 671–72 (9th Cir. 2000); *State v. Howard*, 121 N.H. 53, 61, 426 A.2d 457 (1981). But courts must carefully scrutinize the probative value of such evidence, considering factors such as the age of the child, whether the prior sexual experience was similar to what the defendant is accused of doing, and whether the state opened the door by suggesting to the jury that the child was sexually innocent. Rule 412 Sex Offense Cases, 23 Fed. Prac. & Proc. Evid. § 5375.2 n.52–53 (2d ed.) (collecting cases); *Dunlap v. Hepp*, 436 F.3d 739 (7th Cir. 2006) (child's prior sexual experience not sufficiently similar); *United States v. Powell*, 226 F.3d 1181 (10th Cir. 2000) (prosecution did not portray eleven-year-old victim as a sexual innocent). Courts must also examine the reasons for excluding the evidence, including the likelihood of embarrassment or prejudice to the child, and the extent to which admitting the

10

evidence will confuse the jury or require extensive testimony about issues of only marginal relevance to the case. *See Dunlap,* 436 F.3d at 742.

The court concludes that it was not necessary in this case for Paulus to rebut the sexual innocence inference, because there is no reason to think that the jury would have inferred that KCP lacked the sexual knowledge necessary to fabricate her allegations. As the state points out, KCP was 14 years old when the alleged assault occurred. Courts have routinely prevented defendants from introducing evidence to rebut the sexual innocence inference when the complainant is an adolescent, reasoning that most juries would assume that adolescents already have some knowledge of sexual matters. *See, e.g., State v. Schnabel*, 196 N.J. 116, 131, 952 A.2d 452 (2008) ("[n]either [child] was of a tender age, nor can one say that their ages in today's world of movies, sexual education, television, the world-wide web, and magazines were such that either child would not possess knowledge of the acts they described when they first described them.") Paulus cites no authority in which a court has admitted prior sexual experiences to demonstrate that an adolescent complainant had an alternate source of sexual knowledge, nor did the court discover any in its own research.

Further, nothing that occurred at trial would have led the jury to infer that KCP lacked the sexual knowledge needed to fabricate the allegations against Paulus. The state did not make that argument to the jury. (The trial judge told the state that if it did make that argument, that would open the door to introducing the pornography evidence.) And in fact, the trial testimony demonstrated that KCP did have some degree of sexual knowledge. On cross-examination, Paulus's counsel questioned KCP about her use of the word "came" to describe ejaculation; KCP said that she knew that word because kids talk about sex at school, and because she hears words like that on TV, in music, and in movies. Dkt. 7-3, at 51–52. And one of KCP's friends

11

testified that KCP told him that Paulus had "fingered" her, *id.* at 227, demonstrating that KCP was familiar with lay sexual terminology. There is simply no evidence that the jury in this case would have inferred that KCP was sexually innocent, so Paulus did not need to introduce evidence to rebut that inference.

In his reply brief, Paulus argues that even if a jury would not find a 14-year-old sexually innocent as a general matter, there is no evidence that KCP had knowledge of the specific sexual acts that she described Paulus doing. But the relevant question is whether the jury would have inferred that KCP lacked the knowledge necessary to fabricate these events. KCP described Paulus sitting her on top of him and then moving her hips back and forth with his hands until he "came." Dkt. 7-2, at 164–66. She also said that his fingers went under her underwear and inside her vagina. *Id.* at 168–69. The trial testimony established that KCP knew how to describe both of these sexual acts before she viewed any of the pornography at issue, so it's not plausible that the jury would have inferred that she was too sexually innocent to fabricate the allegations.

Paulus also argues that, even if the jury wouldn't have inferred sexual innocence, the pornography evidence explained why KCP described the assault in much greater detail at her forensic interview compared with her initial interview with detectives. Paulus says that the jury could have inferred that KCP used the pornography as "research" to ensure that her fabricated description of the assault was detailed and realistic. Paulus argues that the trial court unfairly permitted the state to put in testimony from a forensic psychologist explaining that children who are assaulted often make "piecemeal disclosure[s]," Dkt. 7-3, at 204–05, but denied him an opportunity to present his own theory for KCP's inconsistent descriptions of the assault.

12

The problem is that Paulus's "research" theory is little more than speculation. Paulus has no evidence that viewing pornography was an unusual activity for KCP, and his theory is undermined by the entirely unrelated content that KCP viewed around the same time, including "furry" pornography and pornography involving anime characters. Dkt. 7-2, at 15. Defendants have a constitutional right to introduce evidence that shows a "prototypical form of bias" on the part of a witness, such as a motive to lie, but they aren't entitled to attack a witness's credibility in any way they want, no matter how speculative. *Compare Davis v. Alaska*, 415 U.S. 308, 316–18 (1974) (motive to lie) *and Sussman v. Jenkins*, 636 F.3d 329 (7th Cir. 2011) (motive to lie) *with United States v. Saunders*, 166 F.3d 907 (7th Cir. 1999) (speculative theory that witness was biased in favor of the government). Paulus was allowed to probe the inconsistencies in KCP's description of the assault and to suggest a reason why she might have fabricated the allegations; specifically, that KCP answered "yes" when her friend asked her if she had been raped, and then got in over her head and felt that she couldn't back out. *See* Dkt. 7-4 (defense closing argument), at 65. The exclusion of the pornography evidence did not prevent Paulus from presenting his fabrication theory, so it did not violate his constitutional rights. *See United States v. Sanders*, 708 F.3d 976, 990 (7th Cir. 2013) (Confrontation Clause is implicated when a defendant is "completely forbidden" from exposing a witness's bias).

The court also concludes that excluding the pornography evidence was not arbitrary or disproportionate to the purposes advanced by the exclusion. *See Harris*, 698 F.3d at 626. Paulus says that exclusion was a disproportionate response because the risk of embarrassment to KCP could have been ameliorated by introducing the evidence through a detective instead of through KCP herself. But Paulus ignores the risks other than embarrassment, including unfair prejudice and confusion of the issues. If Paulus had been permitted to introduce the "Grinding

13

StepDads Cock for Cash" video and the image of a woman wearing underwear sitting on a naked man's lap, that would have opened the door for the state to introduce evidence of the unrelated pornography that KCP had viewed around the same time. The state would also likely have wanted to introduce evidence that KCP's pornography searches were normal for a 14-year-old, or that it was common for survivors of sexual assault to view pornography to process what had occurred. The result, as the trial court observed, would have been a wide-ranging presentation about an issue of only marginal relevance, distracting the jury from the main issues in the case. *See* Dkt. 7-3, at 11. The trial court was within its discretion to exclude evidence to avoid that result. *Cf. Nevada v. Jackson,* 569 U.S. 505, 511 (2013) ("The admission of extrinsic evidence of specific instances of a witness' conduct to impeach the witness' credibility may confuse the jury, unfairly embarrass the victim, surprise the prosecution, and unduly prolong the trial. No decision of this Court clearly establishes that the exclusion of such evidence for such reasons in a particular case violates the Constitution.")

The bottom line is that Paulus fails to show that KCP's pornography searches had more than minimal relevance to KCP's credibility. Paulus was able to present his defense theory that KCP had made inconsistent, spur-of-the-moment allegations in response to a question from a friend about whether she had been raped. The court concludes that the excluded pornography evidence was not essential to Paulus's defense and the trial court did not apply the evidentiary rules arbitrarily or disproportionately. Paulus's contention that the trial court violated his constitutional rights fails on the merits.

### B. Harmless error

Even if the state court's exclusion of the pornography evidence were a constitutional error, Paulus cannot obtain habeas relief unless he can show that the Wisconsin Court of

14

Appeals' finding of harmless error (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d); *Brown v. Davenport,* 596 U.S. 118, 127 (2022) (state court's harmless-error determination qualifies as an adjudication on the merits subject to review under AEDPA). The parties agree that the clearly established law that applies here is *Chapman v. California,* 386 U.S. 18 (1967), which held that, for cases reviewed on direct appeal, a constitutional error is harmless if the state proves "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 24. Whether an error is harmless in a particular case depends upon several factors, including the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case. *Delaware v. Van Arsdall,* 475 U.S. 673, 684 (1986)

The state court of appeals recognized and applied the correct standard, citing *State v. Nelson*, 2014 WI 70, which holds that an error is harmless in a criminal case if the state can demonstrate beyond a reasonable doubt that a "rational jury would have found the defendant guilty absent the error." *Id.* ¶ 44. Paulus concedes that the *Nelson* standard is consistent with *Chapman*. So the question is whether the state court applied *Chapman* "unreasonably" when it found the exclusion of the pornography evidence to be harmless. An "unreasonable application" of clearly established federal law means that the state appellate court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law

15

beyond any possibility for fairminded disagreement." *Harrington v. Richter,* 562 U.S. 86, 103 (2011). In other words, Paulus must persuade this court that no "fairminded juris[t]" applying *Chapman* could reach the same conclusion as the Wisconsin Court of Appeals. *Davenport,* 596 U.S. at 135 (quoting *Davis v. Ayala,* 576 U.S. 257, 269 (2015)).

Nor is the reasonableness test the only hurdle Paulus must clear to receive habeas relief. If Paulus shows that the state court of appeals unreasonably applied clearly established law, then this court must then conduct its own harmless error analysis under *Brecht v. Abrahamson,* 507 U.S. 619 (1993). The question under *Brecht* is whether the trial court's error had a "substantial and injurious effect or influence" on the jury's verdict. *Davenport,* 596 U.S. at 133. A federal court may not grant habeas relief unless it harbors "grave doubts" about whether the trial court error affected the jury's verdict. *Id.* at 136.

The state court of appeals reasoned that the pornography evidence would not have changed the outcome of this case, for two reasons. First, the jury's acquittal on the sexual assault charge demonstrates that it already doubted KCP's credibility, so additional evidence on that point would not have made a difference. Second, the pornography had "no bearing on Paulus's intent" to have sexual contact with KCP, which is all the state needed to prove for the enticement charge. *Paulus*, 2023 WL 4195567, at *2. On this second point, the court of appeals reasoned that the state had introduced strong evidence of Paulus's improper intent, specifically the Snapchat messages Paulus had sent KCP in the weeks before the alleged assault in which he called her "hon" and "sweetheart," told her that he had a "nice dream" about her, and asked her if she just needed company or was "craving more," and the message several days after the

16

alleged assault in which Paulus asked KCP if they were "still friends."[3] The court also noted that Paulus had agreed to pick KCP up a block away from her house so that KCP's dad wouldn't know she was going to Paulus's house. *Paulus*, 2023 WL 4195567, at *2.

There are some logical flaws in the court of appeals' reasoning. As Paulus points out, the jury's acquittal doesn't necessarily mean that it disbelieved KCP's account of the sexual assault; juries reach split and even inconsistent verdicts for many reasons, including "mistake, compromise, or lenity." *United States v. Powell*, 469 U.S. 57, 65 (1984). Nor did the court of appeals fully explain why it believed that the pornography had "no bearing" on Paulus's intent to have sexual contact with KCP. As Paulus points out, if the jury believed that KCP had fabricated the allegations, that would call into question not only whether sexual contact occurred, but also whether Paulus intended to have sexual contact. But the question isn't whether the court of appeals provided an airtight explanation for its conclusion, but whether a fair-minded jurist could have reached the same conclusion. *See Harrington*, 562 U.S. at 98. The court of appeals' harmless error analysis clears that low bar.

Paulus is correct that the evidence of intent that the court of appeals relied on, including the Snapchat messages and Paulus's habit of picking KCP up a block away from her house, was not overwhelming. The Snapchat messages are subject to competing interpretations, and as Paulus points out, it was KCP, not Paulus, who requested that she be picked up a block away. But ultimately, the harmless error question turns on the probative value of the pornography

---

[3] Based on the court's own review of the Snapchat messages, it seems that Paulus did not actually ask KCP if they were "still friends" after the alleged assault. *See* Dkt. 15-4. But he did express that general sentiment. On January 3, after KCP rebuffed Paulus's invitation to come over again that weekend, Paulus asked her, "are you upset with me at all? Are we good?" *Id.* at 12. KCP responded: "No, I'm not upset with you, promise, we're good." *Id.*

17

evidence. The court has already explained that the pornography evidence was only minimally relevant to whether KCP fabricated the assault allegations. And its relevance is even less in light of the jury's acquittal on the sexual assault charge. The enticement charge did not require the state to prove that any sexual contact had occurred, so the jury could have convicted Paulus on the enticement charge even if it did not fully believe KCP's account of what happened. Given the extremely limited relevance of the pornography evidence to the elements of the enticement charge, the harmfulness of its exclusion is not apparent beyond fair-minded disagreement.

Paulus also cannot meet the *Brecht* standard. As explained above, this court agrees with the trial court that the pornography evidence had little bearing on why or how KCP might have fabricated the assault allegations against Paulus, and even less bearing on whether Paulus intended to have sexual contact with KCP, which is all the state needed to show to prove enticement. Thus, the court harbors no grave doubts as to whether the exclusion of this evidence had a substantial and injurious effect on the verdict. Paulus's habeas petition will be denied.

### C. Certificate of appealability

Under Rule 11 of the Rules Governing Section 2254 cases, the court must issue or deny a certificate of appealability when entering a final order adverse to a petitioner. To obtain a certificate of appealability, the applicant must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Tennard v. Dretke*, 542 U.S. 274, 282 (2004). This means that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller El v. Cockrell*, 537 U.S. 322, 336

(2003) (internal quotations and citations omitted). The rule allows a court to ask the parties to submit arguments on whether a certificate should issue, but it is not necessary to do so in this case. Reasonable jurists would not debate the outcome here, so I will not issue Paulus a certificate of appealability. He may seek a certificate from the court of appeals under Fed. R. App. P. 22.

## ORDER

IT IS ORDERED that:

1. The petition for a writ of habeas corpus filed by petitioner Todd Paulus IV, Dkt. 1, is DISMISSED.

2. Paulus's motion to supplement the record, Dkt. 18, is GRANTED.

3. Petitioner is DENIED a certificate of appealability. If petitioner wishes, he may seek a certificate from the court of appeals under Fed. R. App. P. 22.

Entered March 26, 2026.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge